944 So.2d 1153 (2006)
Aziz MATAR, Appellant,
v.
FLORIDA INTERNATIONAL UNIVERSITY, Appellee.
No. 3D05-1444.
District Court of Appeal of Florida, Third District.
December 13, 2006.
*1155 Lisa S. Walsh, Miami, for appellant.
Hinshaw & Culbertson LLP, and James H. Wyman, Ft. Lauderdale, for appellee.
Before, COPE, C.J., and FLETCHER and ROTHENBERG, JJ.
ROTHENBERG, Judge.
Aziz Matar ("Mr. Matar") appeals his expulsion from Florida International University ("FIU") upon FIU's determination that Mr. Matar engaged in academic misconduct. Because the evidence more than amply supports FIU's ultimate determination and because Mr. Matar failed to demonstrate any material error in the underlying academic grievance proceeding, we affirm.
Mr. Matar was a student at FIU's construction management program. During the spring semester of 2005, Mr. Matar enrolled in BCN 4910 Senior Project ("Course"), a course required for a bachelor's degree in construction management. As part of the Course, each student was required to develop his or her own hypothetical construction company.
On March 2, 2005, Mr. Matar submitted his midterm project for the Course, comprised of a large document setting forth the details of his hypothetical construction company. After reviewing Mr. Matar's project, the instructor for the Course, Professor Gene Farmer ("Prof. Farmer"), concluded that portions of Mr. Matar's midterm project were identical to a project that had been submitted by other students the previous semester. Prof. Farmer also suspected that the architectural office plan drawings and a construction cost estimate submitted were not prepared by Mr. Matar.
On March 9, 2005, Prof. Farmer met with Mr. Matar in the presence of the Chairman of the Construction Management Department, Dr. Irtishad Ahmed, confronted Mr. Matar with the allegations, and informed him that a formal academic misconduct charge would be filed against him. Accordingly, on March 17, 2005, Prof. Farmer filed the formal charge of academic misconduct and alleged that Mr. Matar had plagiarized other students' work, submitted work that was not prepared by him, and violated the class academic honesty pledge signed by him. Prof. Farmer indicated that because Mr. Matar previously received an "F" in a structures course as a result of being caught cheating, he felt it was best to resolve the matter via a formal charge of academic misconduct.
On March 18, 2005, the Vice-Provost for Academic Affairs, Kenneth E. Johnson ("Vice-Provost"), sent Mr. Matar a certified letter advising him of the charge of academic misconduct by Prof. Farmer. The Vice-Provost enclosed a copy of the 2004-2005 FIU Student Handbook ("Handbook"), specifically directing Mr. Matar to read the Code of Academic Integrity ("Code") section of the Handbook, and also enclosed a copy of the materials *1156 detailing the allegations. The Vice-Provost specified that the matter could not be resolved through an informal resolution and requested that Mr. Matar inform him, in writing, whether he would like to have the matter resolved by administrative disposition, administrative hearing, or by a University Academic Conduct Review Board ("Review Board") hearing. The letter included the contact information for Margaret Cuchel ("Ms. Cuchel") in the Vice-Provost's office should Mr. Matar have any questions.
On March 28, 2005, Mr. Matar contacted Ms. Cuchel by telephone to inform her that he wished to have his case resolved by an administrative hearing. Ms. Cuchel corresponded via e-mail with Mr. Matar, Prof. Farmer, and the Vice-Provost in order to confirm the administrative hearing and to set the date for April 7, 2005. That same afternoon, Mr. Matar wrote Ms. Cuchel an e-mail stating "i spoke with profeesor farmer from an hour ago and he will resolve this situation with dr. jhonsen without a hearing" [sic]. Ms. Cuchel responded to Mr. Matar and specified that the administrative hearing was nonetheless proceeding as scheduled on April 7, 2005.
The April 7, 2005 hearing was held with Mr. Matar, Prof. Farmer, and the Vice-Provost in attendance. Prof. Farmer presented evidence and testified that Mr. Matar had engaged in cheating, plagiarism, and academic dishonesty. During Prof. Farmer's testimony, Mr. Matar attempted to comment but the Vice-Provost told him to wait until it was his time to present his side of the story, and directed Mr. Matar to address his comments to him, not to Prof. Farmer.
In response to the evidence, Mr. Matar admitted that he had hired an architect to render drawings for the design of the office but argued that he was only doing what a contractor would do in "the real world." He also admitted that he used approximately ten percent of a senior project submitted the previous semester by other students. He explained that he was enrolled in the course taken by these other students the previous semester, and participated with them on the previous group project. Mr. Matar claimed that although he dropped the class after two weeks, he continued working with the group as he intended to submit the group's ultimate plan the next semester when he re-took the class.
After Mr. Matar's presentation of the evidence, the Vice-Provost asked him if there was anything he wished to add. In response, Mr. Matar asked that he not be penalized in the matter. After the proceedings had concluded, Mr. Matar requested to ask a question of Prof. Farmer. The Vice-Provost responded "No questions for Professor Farmer. Ask me." Mr. Matar, therefore, directed his question to the Vice-Provost, which was whether he could take his project book with him. The Vice-Provost responded negatively and concluded the hearing.
On April 14, 2005, the Vice-Provost issued his decision, finding that Mr. Matar had engaged in plagiarism, cheating and collusion, and expelled Mr. Matar from FIU. The Vice-Provost advised Mr. Matar that he had the right to appeal the decision to the President of FIU as outlined in the Code. After exhausting his administrative remedies, Mr. Matar filed the instant appeal.
In this appeal, Mr. Matar argues that his due process rights were violated because (1) formal review proceedings were improperly waived; (2) he was precluded from confronting or cross-examining his accuser; (3) he was improperly deprived of proceeding in an informal review process; and (4) the penalty was too severe.
*1157 Section 120.68, Florida Statutes, provides that "[a] party who is adversely affected by final agency action is entitled to judicial review." § 120.68(1), Fla. Stat. (2005); Morfit v. Univ. of S. Fla., 794 So.2d 655, 656 (Fla. 2d DCA 2001). A district court reviewing a final agency action shall reverse or set aside agency action if it finds that "[t]he fairness of the proceedings or the correctness of the action may have been impaired by a material error in procedure or a failure to follow prescribed procedure." § 120.68(7)(c), Fla. Stat. (2005); see also Ames v. Dist. Bd. of Trustees, Lake City Cmty. Coll., 908 So.2d 1142, 1143 (Fla. 1st DCA 2005)(specifying that Florida's Administrative Procedure Act ("APA") permits reversal only upon a showing of "material error in procedure or a failure to follow prescribed procedure"). This standard of review "has been characterized as the APA's version of the harmless error rule." Ames, 908 So.2d at 1143 (emphasis added).
Florida universities and community colleges follow different procedures than other administrative agencies. Morfit, 794 So.2d at 656. "In any proceeding in which the substantial interests of a student are determined by the state university system or a community college district, sections 120.569 and 120.57 (the general due process provisions of the Administrative Procedure Act) do not apply." Id.; § 120.81(1)(g), Fla. Stat. (2005). Rather, pursuant to section 6C-6.0105(1) of the Florida Administrative Code, each university president is directed to "establish university rules that ensure fairness and due process in student disciplinary proceedings and that guarantee the academic integrity of the university." Fla. Admin. Code R. 6C-6.0105(1).
An agency violates a person's due process rights if it ignores rules promulgated thereby which affect individual rights. Armesto v. Weidner, 615 So.2d 707, 709 (Fla. 3d DCA 1992). Mr. Matar contends that FIU violated his due process rights when it failed to follow its own rules in failing to obtain Mr. Matar's waiver of a formal hearing before the Review Board in writing. We disagree.
FIU followed the procedure as specified in its Code. FIU's Code specifies that a charged student must respond in writing to the Office of Academic Affairs no later than seven days after receipt of notice of the complaint. If the charged student does not respond within seven calendar days upon receipt of the notice, he or she will be considered to have waived his or her right to a Review Board hearing and an administrative disposition hearing will be arranged. In this case, the record demonstrates that Mr. Matar confirmed in writing to Ms. Cuchel that he elected to have his matter resolved by an administrative hearing. Thus, FIU did not violate Mr. Matar's due process rights in following its own rules pertaining to the waiver of a Review Board hearing.
Mr. Matar, however, claims that FIU failed to follow the requirements of Florida's Administrative Code. Section 6C-6.0105(6)(c) of the Florida Administrative Code requires that due process must include as a minimum, a prompt disciplinary proceeding before a committee, panel, or court composed of at least one-half students, unless waived by the charged student "in writing on forms provided by the university which include an explanation of the effect of the waiver." Fla. Admin. Code R. 6C-6.0105(6)(c).
We conclude that this claim was not preserved for appellate review before this court. Mr. Matar had two opportunities below to argue that because he did not waive the Review Board hearing on a form provided by the university, his due process rights were violated, first during the administrative *1158 hearing and subsequently, on appeal to the President of FIU. He did not do so, and thus, has not preserved the issue for appellate review before this court. See Augustin v. State Unemployment Appeals Comm'n, 906 So.2d 1238, 1239 (Fla. 4th DCA 2005)(holding that where appellant did not raise due process objection to telephonic hearing at the time of the hearing, the argument was not preserved for appellate review); see also Anderson v. Sch. Bd. of Seminole County, 830 So.2d 952, 952-53 (Fla. 5th DCA 2002)(holding that any due process objections based on insufficient notice and failure to advise appellant of her due process rights were not preserved for appeal as appellant failed to raise her objections during the expulsion hearing).
Even if we were to conclude that the issue had been preserved, we would deny the claim on the merits. Although FIU did not strictly comply with Rule 6C-6.0105(6)(c), as Mr. Matar did not waive his right to the Review Board hearing on forms provided by the university, FIU did substantially comply with the requirements thereof and Mr. Matar subsequently waived his right to a Review Board hearing in writing. See Ames, 908 So.2d at 1143-44 (specifying that although the college board did not strictly follow prescribed procedure, the board nonetheless gave complainant substantially the same opportunity to present evidence as complainant would have received had the board strictly followed prescribed procedure).
The record reflects that the Vice-Provost sent Mr. Matar written notice on March 18, 2005, advising him of the charge of academic misconduct by Prof. Farmer. The Vice-Provost included a copy of the FIU Student Handbook directing Mr. Matar specifically to "[p]lease read the copied section of Academic Misconduct (pp. 39-44)," which delineates the misconduct grievance procedures of the university.[1] (emphasis in original). This enclosed Academic Misconduct provision, or the Code, which Mr. Matar was specifically directed to read, details all of the grievance procedures and rights available to Mr. Matar for resolution of the academic misconduct charge within FIU's judicial system, including via an Administrative Disposition hearing or Review Board hearing. Further, the Vice-Provost, in the notice, informed Mr. Matar that "[i]t is extremely important that you inform me, in writing, whether you wish your case be resolved by Administrative Disposition (used only if you are not disputing the charges), Administrative Hearing or be heard by the University Academic Conduct Review Board (UACRB)." (emphasis in original). Thus, we conclude that FIU gave Mr. Matar substantially the same opportunity to waive the Review Board hearing in writing as he would have had, had FIU given him a specific waiver form. FIU's failure to strictly "comply with the procedural requirements of the rule must be considered at most harmless error." Ames, 908 So.2d at 1144; see also Boone v. Office of Provost, Fla. Int'l Univ., 920 So.2d 702, 702 (Fla. 3d DCA 2006)(affirming order of student's dismissal because "any arguable defect in the underlying academic grievance process did not adversely affect her substantial rights to due process or otherwise").
Both FIU's Code and Florida Administrative Code Rule 6C-6.0105(6)(f) and (g) provide that the student may present *1159 information in his or her own behalf and that the student may hear and question adverse witnesses. Mr. Matar alleges that FIU did not comply with these Rules and that his due process rights were violated when he was "precluded" from cross-examining his accuser and presenting evidence in his behalf during the administrative hearing. We disagree.
A careful review of the transcript of the proceedings reflects that Mr. Matar never attempted to cross examine the sole witness against him, Prof. Farmer, and that Mr. Matar was permitted to fully present his case. The only witnesses to testify during the proceedings were Prof. Farmer, who testified first, and Mr. Matar.
The proceedings commenced with each witness introducing themselves. Prof. Farmer was then asked to "state [his] case." Prof. Farmer began by explaining the Course and the document "book" Mr. Matar submitted, which was the subject of the complaint. When the Vice-Provost asked Prof. Farmer when this book had been submitted by Mr. Matar, Prof. Farmer responded that it "was submitted about eight weeks into the semester." Mr. Matar interrupted and supplied the actual date, March 3rd. As Prof. Farmer continued to testify, the Vice-Provost indicated that Prof. Farmer had identified twenty-seven items in Mr. Matar's "book," which he claimed were identical to those submitted by the previous semester's class, and asked Mr. Matar if they needed to address each one or whether Mr. Matar was stipulating to any. Mr. Matar responded that while it was "the same formula," the wording was different and asked if he could talk, and was told that he could in a minute.
Johnson: Okay. Mr. Matar, do we have to go through all, Professor Farmer has indicated that there are about 27, he has identified 27 that are, that are the same as in the project, do we have to go over each one, or?
Matar: Can I talk now?
Johnson: Do you stipulate that those are the same?
Matar: It's not, it's the same formula but it's not the same exact words. Can I say something?
Johnson: Just a minute.
As Mr. Matar was not willing to stipulate to any of the evidence, Prof. Farmer identified some of the areas of Mr. Matar's submission which he claimed were not Mr. Matar's independent work. Mr. Matar interrupted him again in an attempt to explain his conduct and was told that he would be given a chance to respond.
Matar: This is common in any construction 
Johnson: Please, you'll have your chance to respond. You need to be listening.
Further on, Mr. Matar interrupted the testimony again to argue with Prof. Farmer regarding how many times after he was confronted about his assignment, did he and Prof. Farmer meet with the chair. Prof. Farmer claimed it was once or twice, and Mr. Matar insisted that it was only once, asking again if he could "say [his] side of the story." During this exchange, Mr. Matar was instructed to speak to the Vice-Provost, not to Prof. Farmer, and was told that he could present his side of the story in a minute.
Farmer: We had met on several occasions with the chair. We met on March 9th with the chair, and we met once or twice subsequent to that. Because every time that the chair was there, when Mr. Matar would come in, I would call the chair in.
Matar: No. Only once you called the chair.
Farmer: No. I said twice.

*1160 Johnson: Speak to me, please.
Matar: No, he was there once. Once after the class. Once after the class, he came and he showed them exactly, he said the same words that he said to you, only once. I came to Professor Farmer twice so I can resolve this situation, and one time when I resolve this situation it couldn't happen, and I came to you and I talked to you, and you told me that one your best interests is to go and solve it with the professor. And that was the second time after he talked to Dr. Ammad. Can I say my side of the story about this one?
Johson: Yes, just a minute.
Matar: Okay.
Prof. Farmer was asked one additional question and then Mr. Matar was permitted to present his case, which he did without interruption by Prof. Farmer.
After the proceedings concluded, Mr. Matar asked the Vice-Provost if he could ask Prof. Farmer "another question." When he was instructed to pose his question to the Vice-Provost, Mr. Matar simply asked if he could have his book back and was told that he could not.
What this review reveals is that Mr. Matar was not precluded from cross-examining Prof. Farmer or from presenting any and all evidence he wished to present, but rather, that he was not permitted to testify, present evidence, or argue with Prof. Farmer during Prof. Farmer's testimony. After Prof. Farmer testified, Mr. Matar was able to and did "present his side of the story," which was essentially an explanation of his conduct. The only question he attempted to ask Prof. Farmer was whether he could have his book back, a question not relevant to the proceedings and which was answered by the Vice-Provost. We, therefore, conclude that this appellate issue is without merit.
We also find Mr. Matar's arguments that he was improperly deprived of an informal resolution hearing and that the penalty imposed was too harsh, equally unavailing. FIU's Code provides that if it is determined that a charged student "has a prior record of being found responsible for academic misconduct," then the charged student cannot enter into an informal resolution agreement. In this case, it was determined and properly documented that Mr. Matar had previously engaged in academic misconduct and thus, Mr. Matar could not enter into an informal resolution agreement. The determination that Mr. Matar had previously engaged in academic misconduct and therefore, was not eligible for an informal resolution, is clearly a discretionary determination, as was the sentence imposed, and to which we find no abuse of discretion. See § 120.68(7)(d), Fla. Stat. (2005).

CONCLUSION
Due process in student disciplinary proceedings requires "adequate notice, an opportunity to be heard, and substantial evidence to support the penalty." Student Alpha ID No. Guja v. Sch. Bd. of Volusia County, 616 So.2d 1011, 1012 (Fla. 5th DCA 1993). Student disciplinary proceedings, however, "do not require the same safeguards afforded criminal defendants." Id. The due process requirement of a student administrative proceeding is that the proceeding must be "essentially fair." Id. at 1013; see also Abramson v. Fla. Int'l Univ., 704 So.2d 720, 720 (Fla. 3d DCA 1998)(finding student's due process violations argument without merit as the record demonstrated that the proceeding was "essentially fair").
In this case, Mr. Matar not only received timely written notice of the charges, an opportunity to specifically elect the type *1161 of hearing he wished to avail himself of, and ample time to respond to the charges against him and to be fully prepared for the administrative hearing, but he also was given the opportunity to present any evidence he wished to present and was able to dispute or explain the evidence presented against him. Although we conclude that Mr. Matar did not attempt to cross-examine Prof. Farmer, even if we were to find otherwise, he was told that he could pose his questions to Prof. Farmer through the Vice-Provost. That Mr. Matar did not avail himself of the opportunity to question Prof. Farmer through the Vice-Provost cannot be characterized as a violation of due process. See Nash v. Auburn Univ., 812 F.2d 655, 664 (11th Cir.1987)(finding that failure of charged students to avail themselves of opportunity to cross-examine witnesses through the chancellor could not be characterized as a violation of the students' due process).
We also find that, even if we were to rely solely upon Mr. Matar's admissions, sufficient grounds for his expulsion exist. Mr. Matar admitted to using the work of others when precluded from doing so, hiring and using an architect for the office plans, and failing to disclose or give credit to these sources. He also had previously been caught cheating and had received an "F" in the corresponding course. Consequently, the evidence more than amply supports FIU's ultimate determination to expel Mr. Matar.
Affirmed.
NOTES
[1] The Academic Misconduct provision specified by the Vice-Provost is the same provision referred to herein as FIU's "Code."