992 So.2d 338 (2008)
Dr. Massood JALLALI, Appellant,
v.
NOVA SOUTHEASTERN UNIVERSITY, INC., Appellee.
No. 4D07-2351.
District Court of Appeal of Florida, Fourth District.
October 1, 2008.
Rehearing Denied October 27, 2008.
*339 Scott Alan Mager and Gary S. Gaffney of The National Trial Group, LLC, Fort Lauderdale, and Stewart L. Karlin of Karlin Law Group, P.A., Fort Lauderdale, for appellant.
Nancy H. Henry, Cristina Alonso and Erin Kinney of Carlton Fields, P.A., Miami, for appellee.
GROSS, J.
Massood Jallali, a student in the Osteopathic Medical Program, sued Nova Southeastern University for breach of an implied contract. The suit alleged that Jallali had satisfied the terms and conditions for graduation from Nova's osteopathic program, but that the university refused to confer a degree upon him. Jallali sought reimbursement for $250,000 in tuition costs, lost earnings while in school of $836,869, and lost future earnings of $6,900,000. A jury returned a verdict for $819,000. On appeal, Jallali challenges a ruling excluding an expert witness as to lost future earnings and Nova cross appeals the trial court's denial of its motion for directed verdict. Because we hold that the circuit court erred in denying Nova's motion for directed verdict, we do not reach the evidentiary issue raised on Jallali's appeal.
Jallali matriculated at Nova in the 1998-99 academic year, with an expected graduation date of May 2002. Nova provided Jallali with a 1998-99 Student Handbook which set forth graduation requirements for the osteopathic program: two years of course work, two years of clinical rotations, passing the Comlex Level I exam, and taking the Comlex Level II exam. Although a student was not required to pass the Comlex Level II exam to obtain a degree, the student was required to sit for the exam within a "six year limit for completing all graduation requirements."
The 1998-99 Student Handbook, as well as all handbooks issued during Jallali's time at Nova, expressly reserved the school's right to amend, modify, add to, or delete its rules, policies, and procedures. The Handbook stated that each student was responsible for knowing the "current academic regulations, the general and specific requirements and the operational policies contained in the College Handbook, *340 Division Catalog and all other official documents or announcements of the College." That section also provided that the Dean reserved the right to "revise or modify any of these policies at any time, if he feels it is in the best interest of a student or the College to do so."
Jallali failed five required first year courses, so his expected graduation date changed from May 2002, to May 2003. Given this number of failed courses, Jallali could not have graduated with his class in 2002.
Beginning in the 1999-2000 academic year, the Student Handbook changed the osteopathic program's graduation requirements to require students in the 1999 entering class to pass both Comlex Level I and II exams to obtain a degree. The applicable Student Handbook stated: "All students in the class of 2003 or thereafter are required to pass both the Comlex Level I examination and the Comlex Level II examination of the National Board of Osteopathic Medical Examiners in order to graduate."
In 2002, Nova notified Jallali that he was required to satisfy all graduation requirements, including passing the Comlex Level I and II, within six years from matriculation.
Jallali failed the Comlex Level I exam five times. After the first two failures, Nova sent Jallali reminders that he was required to pass the Comlex Levels I and II exams within six years of matriculation.
Finally, in October 2004, Jallali passed the Comlex Level I exam on his sixth attempt. He took the Comlex Level II exam for the first time in January 2005 and failed.
In March 2005, Nova referred Jallali to the Student Progress Committee to consider dismissal for failure to complete graduation requirements within the prescribed time. The letter noted that "the College's graduation requirements as specified in the Student Handbook (June 2004) confirm that all students in the classes of 2003 or any following years must pass both Comlex Level I and II no more than two years after completion of all coursework requirements." It further stated that "since the next offering of the Comlex Level II examination is not until August 2005, [Jallali would] not have sufficient time to complete this graduation requirement prior to the May 23, 2005 deadline."
Jallali responded that the requirements set forth in the 1998-99 Student Handbook applied to him, because he started the program in 1998. Under those standards, he had satisfied the Comlex exam requirementshe had passed the Level I exam and had sat for the Level II exam.
The Student Progress Committee recommended that Jallali be given one more opportunity to pass the Level II exam by September 1, 2005 to avoid dismissal. Nova's Dean wrote to Jallali to inform him of this decision. The letter noted that even though Jallali had failed to satisfy the necessary exam requirements within six years of matriculation, he "was afforded the benefit of a [2004] handbook revision allowing [him] to extend the period for meeting [his] board examination requirements until May 2005 (two years after completing all of [his] courses on May 23, 2003)." The letter pointed out that even though Jallali's failure of the January 2005 exam meant he would not be able to comply with the May 23, 2005 deadline, Nova was still giving him "one more opportunity to take and pass" the Level II exam.
Jallali failed the Level II exam for a second time in August 2005. The Student Progress Committee recommended Jallali's dismissal from the program. The Dean agreed. Nova's Appeal Board upheld Jallali's dismissal. Jallali failed the *341 Level II exam for a third time after his dismissal.
Jallali filed suit against Nova for breach of an implied contract, arguing that the 1998-1999 Student Handbook established his graduation requirements. He contended that these degree requirements could not be changed by subsequent handbooks.
At trial, there was testimony concerning the Comlex test requirements.
Linda Machieri, of the American Osteopathic Association ("AOA"), stated that in addition to obtaining a D.O. degree, a doctor needed a license to practice medicine. In Florida, licensure requirements include passing the national board examinations: Comlex Levels I, II, and III.
Dr. John Thornburg, the Chairman of the Committee of the National Board of Osteopathic Medical Examiners, which administers the Comlex examinations to all prospective D.O. physicians nationwide, explained that the Comlex Level II is used "to determine minimal levels of competency in order to practice as a general practitioner of osteopathic medicine." He also explained that the national board believes that medical schools should not award a degree to a student who is unable to pass the Comlex Level II, because such a student would not be able to obtain a license or meet the minimum level of competency.
Thornburg explained that the passage-rate for first-time takers of Level II is between 88 and 91 percent. The passage-rate for second-time test takers is 60 to 80 percent. A very small number of test-takers, probably less than one percent, never pass. If a student had to take the test multiple times, "it would suggest that they have had considerable difficulty achieving that [minimum level of competency]." Thornburg reviewed Jallali's August 2005 scores and explained that Jallali received a "really low score" of 294, which is well under the minimum passing score of 400 on the Comlex Level II.
Dr. Conrad Miscowicz, the Director of the Department of Accreditation with the AOA, explained that the AOA is the accrediting agency for colleges of osteopathic medicine. In 2001, the AOA began the process of changing accreditation standards so that medical schools would require that students pass the Comlex Level II. Medical schools had to add passage of the Comlex Level II as a graduation requirement in order to maintain their accreditation.
Finally, Nova's Dean explained that Nova updated its graduation requirements in 1999 to include passing the Comlex Level II because (1) many residency programs required passage as a prerequisite to application; (2) Nova anticipated that the AOA would change its accreditation standards to impose this requirement; and (3) this would ensure that graduating students were competent to practice medicine.
The Dean pointed out that because Jallali failed several courses his first year and had to repeat them in 1999-2000, he could not graduate in 2002 and was subject to the revised graduation requirement of passing the Comlex Level II exam applicable to classes graduating in 2003 or later. According to the Dean, Jallali and four other students who matriculated with him in 1998, but did not graduate in 2002 due to academic failures, were required to pass the Comlex Level II examination in order to graduate. All students in the 2003 graduating class, and those graduating thereafter, were required to pass the Comlex Level II examination.
The central issue on appeal is whether the circuit court should have granted Nova's motion for directed verdict.
A directed verdict for the defense is proper when the evidence and all *342 inferences from it, considered in the light most favorable to the plaintiff, would justify a finding for the defendant. See, e.g., City of Lauderhill v. Rhames, 864 So.2d 432, 434 n. 1 (Fla. 4th DCA 2003); Knowles v. Hennelly, 793 So.2d 1063, 1065 (Fla. 4th DCA 2001). On appeal, a trial court's ruling on a motion for directed verdict is reviewed de novo. Flagstar Cos., Inc. v. Cole-Ehlinger, 909 So.2d 320, 322 (Fla. 4th DCA 2005).
Nova's legal relationship with Jallali was "solely contractual in character, and there is an implied condition that the student knows and will conform to the rules and regulations of the institution." John B. Stetson Univ. v. Hunt, 88 Fla. 510, 102 So. 637, 640 (1924). Under this contract implied in fact, the student "pays a fee for services" and the private university provides "an educational experience designed to lead to a ... degree." Gross v. Family Servs. Agency, Inc., 716 So.2d 337, 339 (Fla. 4th DCA 1998). A private university "may set forth terms under which it will admit and subsequently graduate students who will subject themselves to the rules, regulations and regimen of the college." Univ. of Miami v. Militana, 184 So.2d 701, 704 (Fla. 3d DCA 1966). "It is generally accepted that the terms and conditions for graduation are those offered by the publications of the college at the time of enrollment. As such, they have some of the characteristics of a contract between the parties, and are sometimes subject to civil remedies in courts of law." Id.; see Sharick v. Se. Univ. of the Health Sciences, Inc., 780 So.2d 136, 138 (Fla. 3d DCA 2000); accord, Univ. of Miss. Med. Ctr. v. Hughes, 765 So.2d 528, 535 (Miss. 2000) (finding "student-university relationship is contractual in nature and that the terms of the contract may be derived from a student handbook, catalog, or other statement of university policy."). Implicit in the student's contract with a private university is the notion that "if the student complies with the terms prescribed by the university, the student will obtain a degree." Sharick, 780 So.2d at 139.
Whether Nova was entitled to modify its graduation requirements after Jallali entered the program in 1998 is critical to this appeal. The 1998-99 Student Handbook, upon which Jallali relies, provided that the College could "revise or modify" its policies "at any time", making this a discretionary decision of the Dean, subject to the limitations of good faith. This flexibility is consistent with the great deference that courts accord to private universities in setting degree requirements. See Olsson v. Bd. of Higher Educ., 49 N.Y.2d 408, 413, 426 N.Y.S.2d 248, 402 N.E.2d 1150 (N.Y. 1980) (where the court wrote that "[i]n order for society to be able to have complete confidence in the credentials dispensed by academic institutions ... the issuance of these credentials must be left to the sound judgment of professional educators").
The United States Supreme Court has written that "[u]niversity faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation." Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 225 n. 11, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985) (citations omitted). The decision of whether a student is qualified to be a physician is an academic judgment that "requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking." Bd. of Curators of Univ. of Mo. v. Horowitz, 435 U.S. 78, 90, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978).
Adhering to this deferential standard, we join those courts in holding that "implicit in the university's general contract *343 with students is a right to change the university's academic degree requirements if such changes are not arbitrary or capricious." See Univ. of Miss. Med. Ctr., 765 So.2d at 535 (emphasis added); Mahavongsanan v. Hall, 529 F.2d 448, 450 (5th Cir.1976); Doherty v. S. Coll. of Optometry, 862 F.2d 570, 577-78 (6th Cir.1988) ("No record evidence exists that [the school] acted arbitrarily, capriciously or with malice."); Nuttelman v. Case W. Reserve Univ., 560 F.Supp. 1, 3 (N.D.Ohio 1981), aff'd, 708 F.2d 726 (6th Cir.1982); see also John B. Stetson Univ., 102 So. at 640 (indicating that a private college may pass reasonable regulations, "unless such regulations or rules are unauthorized, against common right or palpably unreasonable"). A court will not interfere with a private university's enforcement of its regulations unless the university has acted arbitrarily and capriciously, in violation of a constitution or statute, or for fraudulent purposes. See John B. Stetson Univ., 102 So. at 640; Militana v. Univ. of Miami, 236 So.2d 162 (Fla. 3d DCA 1970).
Mahavongsanan presents a claim almost identical to Jallali's. See Mahavongsanan, 529 F.2d at 448. There, a student sought injunctive relief against a university, claiming a deprivation of her rights by the school's arbitrary and capricious refusal to grant her a master's degree in education. Id. at 440. One of the student's claims was for breach of contract. Id. The student had twice failed to pass a comprehensive examination required for graduation. Id. at 450. Just like Jallali, the student argued that the university breached its contract with her by requiring her to take the comprehensive examination to graduate, which was not a requirement when she enrolled. Id. The Fifth Circuit held that the student's contract claim was without merit "because of the wide latitude and discretion afforded by the courts to educational institutions in framing their academic degree requirements." Mahavongsanan, 529 F.2d at 450. The court explained:
Implicit in the student's contract with the university upon matriculation is the student's agreement to comply with the university's rules and regulations, which the university is entitled to modify so as to properly exercise its educational responsibility. The appellees' claim of a binding, absolute unchangeable contract is particularly anomalous in the context of training professional teachers in post graduate level work.
529 F.2d at 450 (citations omitted). The Fifth Circuit also noted that the university was entitled to require the student to take the exam to grant her a degree as the decision was a reasonable academic regulation "within the expertise of the university's faculty," and the student received timely notice of the new requirement.[1]Id.
The Supreme Court of Mississippi reached the same conclusion as Mahavongsanan on similar facts. In University of Mississippi Medical Center v. Hughes, *344 several medical students sued the medical school for injunctive relief when the university changed its degree requirements after the students had enrolled. 765 So.2d 528, 531 (Miss.2000). The court concluded:
[I]n keeping with the law of sister jurisdictions, that while the student-university relationship is contractual in nature, implicit in the university's general "contract" with its students is a right to change the university's academic degree requirements if such changes are not arbitrary or capricious. This conclusion is reached particularly in light of the great reluctance, expressed by numerous courts, including the United States Supreme Court, to intervene in the academic context. A strict view of contract law  that it is a breach of contract for the University to modify its degree requirements in any instance after a student has enrolled  is rejected. Such a rule would interfere unnecessarily in the University's discretion to manage its academic affairs.
Id. at 535 (internal citations omitted).
Applying these standards, Nova was authorized to change its degree requirements after 1998 to require students to pass the Comlex Level II exam within six years of matriculation. The reasons for the change were to ensure competency to practice osteopathic medicine, to anticipate a change in accreditation requirements, and to comply with a prerequisite of many residency programs. Nova acted within its broad discretion when it exercised its academic judgment to modify the requirements for a D.O. degree. Jallali received adequate notice that he would be required to take the Comlex Level II exam. Students who graduated in 2003 or later were required to pass the Level II exam to conform to rising national standards to obtain a D.O. degree. Neither the university's change in the degree requirement nor its application to Jallali was arbitrary and capricious, or done for a fraudulent purpose.
We reject Jallali's argument that he should be excused from showing that Nova acted arbitrarily and capriciously to prevail on his claim. He urges us to ignore the foregoing case law because it should not apply to a "modern day university," which is more of a "commercial" institution, in the "`business' of selling students degrees" for "cold cash." The rule we apply in this case has its genesis in the Supreme Court's 1924 decision in John B. Stetson Univ., a case which we do not have the authority to overrule. See Hoffman v. Jones, 280 So.2d 431, 440 (Fla.1973).
For these reasons, we hold that the trial court erred in denying Nova's motion for directed verdict. We reverse the final judgment and remand for the entry of a judgment in favor of Nova Southeastern University.
STONE, J., and ROSENBERG, ROBIN, Associate Judge, concur.
NOTES
[1] Hammond v. Auburn Univ., 669 F.Supp. 1555 (M.D.Ala. 1987), followed Mahavongsanan in a case similar to this one. In Hammond, a student brought a breach of contract claim against the university when it changed the electrical engineering degree requirements two years into the student's coursework. Without finding that the student had a binding contract with the university, the court stated that the law "is clear regarding breach of contract claims similar to the plaintiff's herein. Implicit in a student's educational contract with the University is the duty of the student to comply with the University's rules and regulations which the University can modify `so as to properly exercise its educational responsibilities.'" Id. (quoting Mahavongsanan, 529 F.2d at 450). The court also noted that the university specifically reserved the right to modify its graduation requirements.