997 So.2d 1098 (2008)
JEWS FOR JESUS, INC., Petitioner,
v.
Edith RAPP, Respondent.
No. SC06-2491.
Supreme Court of Florida.
October 23, 2008.
Rehearing Denied December 17, 2008.
*1099 Mathew D. Staver and Anita L. Staver, Liberty Counsel, Maitland, FL, Erik W. Stanley, Mary E. McAlister, Rena M. Lindevaldsen, and David M. Corry, Liberty Counsel, Lynchburg, VA, for Petitioner.
*1100 Barry M. Silver, Boca Raton, FL, for Respondent.
Bruce S. Rogow and Cynthia E. Gunther of Bruce S. Rogow, P.A., Fort Lauderdale, FL, and on behalf of Joe Anderson, Jr.; and Gregg D. Thomas, James J. McGuire, and Rachel E. Fugate of Thomas and Locicero, P.L., Tampa, FL, on behalf of Media General Operations, Inc., The New York Times Company, Orlando Sentinel Communications Company, Sun-Sentinel Company, the Florida Press Association, ABC, Inc., ESPN, Inc., the E.W. Scripps Company, the Association of American Publishers, and Cox Enterprises, Inc. (collectively the Florida Media Organizations), as Amici Curiae.
PARIENTE, J.
The issue in this case is whether the tort of false light invasion of privacy should be recognized in Florida. In Rapp v. Jews for Jesus, Inc., 944 So.2d 460 (Fla. 4th DCA 2006), the Fourth District Court of Appeal certified the following question to be of great public importance:
Does Florida recognize the tort of false light invasion of privacy, and if so, are the elements of the tort set forth in section 652E of Restatement (Second) of Torts?
Id. at 468. We have jurisdiction. See art. V, § 3(b)(4), Fla. Const.
Because we conclude that false light is largely duplicative of existing torts, but without the attendant protections of the First Amendment, we decline to recognize the tort and answer the certified question in the negative. In declining to recognize false light, we resolve two additional issues raised by this case. First, we conclude that Florida recognizes a cause of action for defamation by implication. Second, we hold that a communication can be considered defamatory if it "prejudices" the plaintiff in the eyes of a "substantial and respectable minority of the community," as set forth in comment e of the Restatement (Second) of Torts § 559 (1972). We elaborate on these two existing principles of defamation law because they further support our decision not to recognize false light in view of the competing policy considerations.

FACTS AND PROCEDURAL HISTORY
We begin with the facts that gave rise to the claim for false light invasion of privacy in this case, which are based on the allegations contained in the second amended complaint of the petitioner, Edith Rapp. Edith Rapp was married to Marty Rapp until his death in 2003. Bruce Rapp, who was Marty's son and Edith Rapp's stepson, was employed by Jews for Jesus, Inc. Prior to Marty's death, Bruce reported the following account in the Jews for Jesus newsletter:
I had a chance to visit with my father in Southern Florida before my Passover tour. He has been ill for sometime and I was afraid that I may not have another chance to be with him. I had been witnessing to him on the telephone for the past few months. He would listen and allow me to pray for him, but that was about all. On this visit, whenever I talked to my father, my stepmother, Edie (also Jewish), was always close by, listening quietly. Finally, one morning Edie began to ask me questions about Jesus. I explained how G-d [sic] gave us Y'Shua (Jesus) as the final sacrifice for our atonement, and showed her the parallels with the Passover Lamb. She began to cry, and when I asked her if she would like to ask G-d for forgiveness for her sins and receive Y'Shua she said yes! My stepmother repeated the sinner's prayer with me-praise G-d! Pray for Edie's faith to grow and be strengthened. *1101 And please pray for my father Marty's salvation.
Rapp, 944 So.2d at 462. The complaint alleged that the newsletter was published on the internet and seen by one of Edith's relatives. Id.
The gravamen of Rapp's claim is that Jews for Jesus falsely and without her permission stated that she had "joined Jews for Jesus, and/or [become] a believer in the tenets, the actions, and the philosophy of Jews for Jesus." Second Amended Complaint at 2, Rapp v. Jews for Jesus, Inc., No. 502003CA013234XXOCAH (Fla. 15th Cir. Mar. 28, 2005). Rapp's complaint alleged: (1) false light invasion of privacy; (2) defamation; and (3) intentional infliction of emotional distress. The trial court granted Jews for Jesus's motion to dismiss without prejudice and also struck several paragraphs from the complaint described by the Fourth District as "primarily polemical" against Jews for Jesus, Inc. Id. at 462-63.[1]
Rapp then filed an 81-paragraph amended complaint, alleging the same causes of action as the initial complaint, but adding a count for negligent training and supervision. The trial court granted Jews for Jesus's motion to dismiss the counts for false light invasion of privacy and defamation with prejudice, and the counts for intentional infliction of emotional distress and negligent training and supervision without prejudice. In a final attempt, Rapp filed a 101-paragraph second amended complaint, alleging intentional infliction of emotional distress, negligent training and supervision, and negligent infliction of emotional distress. Jews for Jesus again filed a motion to dismiss for failure to state a cause of action and a motion to strike certain allegations. The trial court dismissed this final complaint in its entirety with prejudice. Id. at 463.[2]
On appeal, the Fourth District addressed, among other things, three of Rapp's claims that were dismissed.[3] First, as to the defamation claim, the court determined that the complaint failed to state a cause of action "because the `common mind' reading the newsletter would not have found Edith to be an object of `hatred, distrust, ridicule, contempt or disgrace.'" Id. at 464. In reaching this conclusion, the Fourth District rejected the *1102 standard set forth in section 559, comment e, of the Restatement (Second) of Torts (1977), namely, that a communication is defamatory if it "prejudiced" the plaintiff in the eyes of a "substantial and respectable minority of the community." Id. at 465-66. However, the Fourth District declined to apply comment e because it concluded that this Court had not adopted the "substantial and respectable minority" standard in any case. Id. Accordingly, the district court affirmed the dismissal of the defamation claim based on its understanding of the applicable community standard.
As to the count for the tort of false light, the court reviewed section 652E of the Restatement (Second) of Torts, which defines the cause of action. Id. at 467. The Fourth District noted that the tort involved a "`major misrepresentation' of a person's `character, history, activities or beliefs'" and that just as a misrepresented political party affiliation could be such an example, so too could misrepresentation of a person's religious beliefs. Id. at 467-68. The Fourth District determined that if it were "writing on a blank slate," the court would be inclined to side with the courts that have rejected the cause of action, but concluded that this Court's prior precedent "tacitly recognized the cause of action." Id. at 468. However, because of uncertainty in this area of the law, the Fourth District certified to us the question of whether the tort of false light is recognized in Florida.[4]

ANALYSIS

I. The Origins of False Light
Our discussion of false light naturally begins with an overview of the common law tort of invasion of privacy. First recognized in 1890 as a legal theory by Samuel D. Warren and Louis D. Brandeis,[5] common law invasion of privacy was expounded upon in 1960 by William L. Prosser, a leading scholar in tort law. William L. Prosser, Privacy, 48 Cal. L.Rev. 383 (1960). Prosser proposed that invasion of privacy consisted of four distinct torts: (1) intrusion upon the seclusion of another; (2) commercial appropriation of one's name or likeness;[6] (3) publication of private facts; and (4) false light. Id. at 389. Prosser defined the tort of false light as one that "consists of publicity that places the plaintiff in a false light in the public eye." Id. at 398. The United States Supreme Court in Cantrell v. Forest City Publishing Co., 419 U.S. 245, 95 S.Ct. 465, 42 L.Ed.2d 419 (1974), a case involving the false light theory of invasion of privacy, referred to the claim as being "generally recognized as one of the several distinct kinds of invasions actionable under the *1103 privacy rubric." Id. at 248 n. 2, 95 S.Ct. 465.
In 1977, the Restatement (Second) of Torts codified Prosser's description of the four categories of invasion of privacy and defined false light as follows:
One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
(a) the false light in which the other was placed would be highly offensive to a reasonable person, and
(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.
Restatement (Second) of Torts § 652E. With these background principles in mind, we now address the certified question.

II. To Recognize or Not to RecognizeThat is the Certified Question
This Court has previously acknowledged Prosser's paradigm of the four general categories of invasion of privacy, one of which is a cause of action for false light. See Allstate Ins. Co. v. Ginsberg, 863 So.2d 156, 160-61 (Fla.2003); Agency for Health Care Admin. v. Associated Industries of Fla., Inc., 678 So.2d 1239, 1252 n. 20 (Fla. 1996) (citing Forsberg v. Hous. Auth. of Miami Beach, 455 So.2d 373 (Fla. 1984) (Overton, J., concurring)) [hereinafter AHCA]. However, we have reviewed each of these cases and conclude that the Court was simply repeating citations from academic treatises or law review articles about privacy torts in general or discussing an alternative tort in particular. For example, in AHCA, the Court noted that it had previously recognized a cause of action for invasion of privacy and specifically cited the four general categories outlined by Prosser, which included false light. 678 So.2d at 1252 n. 20 (ruling on the constitutionality of a statute that abolished affirmative defenses recognized at common law). Then, in Ginsberg, the Court again set forth the four general categories of invasion of privacy by quoting AHCA, albeit in the context of deciding whether there was a cause of action for intrusion upon the seclusion of another based upon touching in a sexual manner or sexually offensive comments. 863 So.2d at 162.[7] Importantly, none of these cases actually involved a claim of false light, and we have never discussed any of the competing policy concerns; the issue of whether to recognize false light as a new common law cause of action has never been before the Court. We therefore begin by looking to common law principles and public policy considerations to facilitate our analysis of this issue of first impression.
Florida adopted the English common law as it existed on July 4, 1776, *1104 "to the extent that it [wa]s not inconsistent with the statutes and constitutions of Florida and the United States." Stone v. Wall, 734 So.2d 1038, 1043 (Fla.1999). Although the tort of false light did not exist at common law, this Court can recognize new common law causes of action where that recognition is neither in conflict with contrary legislation nor outweighed by any competing interests.[8] We have explained that the common law "must keep pace with changes in our society" and "may be altered when the reason for the rule of law ceases to exist, or when the change is demanded by public necessity or required to vindicate fundamental rights." Stone, 734 So.2d at 1043 (quoting United States v. Dempsey, 635 So.2d 961, 964 (Fla.1994)). Indeed, this was the impetus for the Court's decision to recognize invasion of privacy as a common law cause of action in Cason v. Baskin, 155 Fla. 198, 20 So.2d 243 (1944).[9] As this Court stated:
The common law has shown an amazing vitality and capacity for growth and development. This is so largely because the great fundamental object and principle of the common law was the protection of the individual in the enjoyment of all his inherent and essential rights and to afford him a legal remedy for their invasion.
Id. at 250.
Based on both the common law and Florida's Constitution, the Court found that the right to privacy was a distinct and cognizable tort. However, the Court recognized that the right would be subject to limitations because of competing rights, such as freedom of speech and of the press, and that the right must be restricted to "ordinary sensibilities" and cannot extend to the hypersensitive plaintiff. Id. at 251. Finally, in discussing the balancing of the rights at stake, the Court agreed that:
The right of privacy does not prohibit the publication of matter which is of legitimate public or general interest. At some point the public interest in obtaining information becomes dominant over the individual's desire for privacy. It has been said that the truth may be spoken, written, or printed about all matters of a public nature, as well as matters of a private nature in which the public has a legitimate interest. However, the phrase "public or general interest," in this connection, does not mean mere curiosity.
Id.
Because there is no statutory prohibition against recognizing the tort of false light and because our case law concerning the other categories of invasion of privacy may seem to support recognition of false light, we next review the main *1105 policy arguments against its adoption. We do this with the view that the "primary purpose of tort law is `that wronged persons should be compensated for their injuries and that those responsible for the wrong should bear the cost of their tortious conduct.'" Clay Elec. Coop. v. Johnson, 873 So.2d 1182, 1190 (Fla.2003) (quoting Weinberg v. Dinger, 106 N.J. 469, 524 A.2d 366, 375-79 (1987)). As cogently explained by the Colorado Supreme Court,
Tort law represents the way in which we draw lines around acceptable and unacceptable non-criminal behavior in our society. Torts are designed to encourage socially beneficial conduct and deter wrongful conduct. See, e.g., Restatement (Second) of Torts, § 901(c) (1979). Correspondingly, liability arises out of culpable behavior wherein the defendant breaches a duty to the plaintiff: crosses the line into unacceptable behavior. Liability not only recompenses the wronged plaintiff, but also deters the socially wrongful conduct in the first place. Hence, clarity and certainty of tort law serves a very important function in regulating how we deal with one another.
Denver Publ'g Co. v. Bueno, 54 P.3d 893, 897-98 (Colo.2002).
Although false light has been recognized in a substantial number of jurisdictions, it "remains the least-recognized and most controversial aspect of invasion of privacy." Id. at 898 (quoting Cain v. Hearst Corp., 878 S.W.2d 577, 579 (Tex.1994)). The reason most often given for rejecting false light is that "it substantially overlaps with another tort, defamation," id. at 898, and allows the plaintiff to circumvent the strict requirements that have been adopted by statute and developed by case law to ensure the right to freedom of expression. Id. at 903-04. Prosser himself expressed these concerns when proposing the tort:
The question may well be raised, and apparently still is unanswered, whether this branch of the tort is not capable of swallowing up and engulfing the whole law of public defamation; and whether there is any false libel printed, for example, in a newspaper, which cannot be redressed upon the alternative ground. If that turns out to be the case, it may well be asked, what of the numerous restrictions and limitations which have hedged defamation about for many years, in the interest of freedom of the press and the discouragement of trivial and extortionate claims? Are they of so little consequence that they may be circumvented in so casual and cavalier a fashion?
Prosser, supra, at 401.
In short, courts rejecting false light have expressed the following two primary concerns: (1) it is largely duplicative of defamation, both in the conduct alleged and the interests protected, and creates the potential for confusion because many of its parameters, in contrast to defamation, have yet to be defined; and (2) without many of the First Amendment protections attendant to defamation, it has the potential to chill speech without any appreciable benefit to society. Because the two concerns are interrelated, we discuss them together below.

A. The Elements: False Light v. Defamation
Although Prosser described false light as one of the four causes of action for invasion of privacy, it is more closely related to defamation than the other three privacy torts. When the elements of false light are compared to those of defamation, the overlap between the two torts is evident. As previously mentioned, false light has the following six elements: (1) publicity; *1106 (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity; (4) actual damages; (5) publicity must be highly offensive to a reasonable person; and (6) publicity must be about the plaintiff. See Restatement (Second) of Torts § 652E; see also Bueno, 54 P.3d at 899-900. Defamation has the following five elements: (1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory. See Restatement (Second) of Torts §§ 558B, 580A-580B. Except for the distinction between publicity that is "highly offensive" and a publication that is "defamatory," which we will discuss in more detail below, a comparison reveals that the elements of these two torts are remarkably similar.

B. Recovery for True Statements that Give a False Impression
Despite the apparent similarity in the elements, one argument often advanced to support the recognition of false light is that, unlike defamation, it allows recovery for literally true statements that create a false impression. See, e.g., Godbehere v. Phoenix Newspapers, Inc., 162 Ariz. 335, 783 P.2d 781, 787 (1989); see also Straub v. Lehtinen, Vargas & Riedi, P.A., 980 So.2d 1085, 1086-87 (Fla. 4th DCA 2007) (stating that a false light cause of action could be based on the publication of true facts that create a false impression); Heekin v. CBS Broad., Inc., 789 So.2d 355, 358 (Fla. 2d DCA 2001). For example, in Heekin, which appears to be the first appellate case in Florida that directly involved a cause of action for false light and discussed the tort in detail, the plaintiff alleged that a broadcast falsely portrayed him as a spouse abuser by juxtaposing an interview with his former spouse along with stories and pictures of women who had been abused and killed by domestic partners. 789 So.2d at 357 ("Heekin's complaint alleged that the specific facts about Heekin contained in the broadcast were true, but that the juxtaposition of these facts with the other stories created the false impression that Heekin had abused and battered his wife and children.").[10] The Restatement also provides for false light recovery in cases like the present one, where statements could be literally true but juxtaposed in such a manner as to create a false impression. Restatement (Second) of Torts § 652E cmt. b (illustrating that a taxi driver whose photograph is used in a news article about drivers who cheat the public on fares has a claim for false light because the article implies that he engages in this practice).
Although proponents often argue that allowing recovery for these types of true statements justifies the necessity of false light, defamation already recognizes the concept that literally true statements can be defamatory where they create a false impression. This variation is known as defamation by implication and has a longstanding history in defamation law. See Stevens v. Iowa Newspapers, Inc., 728 N.W.2d 823, 827 (Iowa 2007) ("Defamation by implication arises, not from what is stated, but from what is implied when a defendant `(1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts, [such that] he may be held responsible for the defamatory implication....'" (quoting W. Page Keeton et al., Prosser & Keeton on the Law of Torts § 116, at 117 (5th ed. Supp. *1107 1988))); Mohr v. Grant, 153 Wash.2d 812, 108 P.3d 768, 774-76 (2005) (same); Guilford Transp. Indus., Inc. v. Wilner, 760 A.2d 580, 596 (D.C.2000) ("[B]ecause the Constitution provides a sanctuary for truth, .... [t]he [defamatory] language must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference." (quoting Chapin v. Knight-Ridder, 993 F.2d 1087, 1092-93 (4th Cir.1993))); Armstrong v. Simon & Schuster, Inc., 85 N.Y.2d 373, 625 N.Y.S.2d 477, 649 N.E.2d 825, 829-30 (1995) ("`Defamation by implication' is premised not on direct statements but on false suggestions, impressions and implications arising from otherwise truthful statements."); see also Milkovich v. Lorain Journal Co., 497 U.S. 1, 13, 20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) (recognizing that defamation can arise where a statement of opinion reasonably implies false and defamatory facts); Cooper v. Greeley & McElrath, 1 Denio 347, 348 (N.Y.Sup.Ct. 1845) (holding that a publisher was liable to James Fennimore Cooper for a publication that implied Fennimore had a poor reputation); Restatement (Second) of Torts § 566 ("A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts....").
Relying on such longstanding precedent, Jews for Jesus and the amici for the media[11] contend that Florida already recognizes a cause of action for "defamation by implication." Although this Court has never directly discussed defamation by implication, district courts in this state have recognized the tort as a valid variation of defamation. See, e.g., Boyles v. Mid-Fla. Television Corp., 431 So.2d 627 (Fla. 5th DCA 1983) (reversing dismissal of libel per se claim based on statements that implied that plaintiff was a suspect in the death of the child, was a habitual tormentor of retarded patients, and had raped a patient in his care), approved, 467 So.2d 282 (Fla. 1985); Brown v. Tallahassee Democrat, Inc., 440 So.2d 588 (Fla. 1st DCA 1983) (reversing trial court's dismissal of plaintiff's complaint that defendant published plaintiff's photograph in a story about a murder in which the plaintiff was not involved but the juxtaposition of the photograph implied his association with the murder). For example, the First District Court of Appeal held that false light should be governed by the same statute of limitations as defamation, rejecting the assertion that only false light claims can be based on statements that are true. Gannett Co. v. Anderson, 947 So.2d 1, 11 (Fla. 1st DCA 2006), approved in part, 994 So.2d 1048 (Fla. 2008). Citing its previous decision in Brown and the Fifth District's decision in Boyles, the First District explained that the "fallacy in this argument is that a claim of libel can also be asserted on the theory that the defamatory fact was implied." Id.
In addition, our own standard jury instructions state that in a claim of defamation, a "statement is substantially true if its substance or gist conveys essentially the same meaning that the truth would have conveyed. In making this determination, you should consider the context in which the statement is made and disregard any minor inaccuracies that do not affect the substance of the statement." Standard *1108 Jury InstructionsCivil Cases (No. 00-1), 795 So.2d 51, 57 (Fla.2001) (emphasis added).[12] The legal significance of the "gist" of a publication was noted in W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 116, at 117 (5th ed. Supp.1988), which stated that while defamation law shields publishers from liability for minor factual inaccuracies, "it also works in reverse, to impose liability upon the defendant who has the details right but the `gist' wrong." Simply put, "if the defendant juxtaposes a series of facts so as to imply a defamatory connection between them, or creates a defamatory implication by omitting facts, he may be held responsible for the defamatory implication, unless it qualifies as an opinion, even though the particular facts are correct." Id. (footnotes omitted).
We agree with petitioner and its amici that defamation by implication is a well-recognized species of defamation that is subsumed within the tort of defamation. All of the protections of defamation law that are afforded to the media and private defendants are therefore extended to the tort of defamation by implication. See, e.g., Locricchio v. Evening News Ass'n, 438 Mich. 84, 476 N.W.2d 112, 133-34 (1991) (stating that defamation by implication claims must conform to the First Amendment principles of general defamation law).[13] Because defamation by implication applies in circumstances where literally true statements are conveyed in such a way as to create a false impression, we conclude that there is no meaningful distinction on that basis to justify recognition of false light as a separate tort.

C. Nature of the Interests Protected
Although there is substantial overlap with defamation, proponents often argue that an important distinction lies in the nature of the interests sought to be protected. As the Restatement explains, it is "not ... necessary to the action for invasion of privacy that the plaintiff be defamed. It is enough that he is given unreasonable and highly objectionable publicity that attributes to him characteristics, conduct or beliefs that are false, and so is placed before the public in a false position." See Restatement (Second) of Torts § 652E cmt. b. For the tort of false light, the standard is whether the statement is highly offensive to a reasonable person. Id. § 652E(a). Conversely, a defamatory statement is one *1109 that tends to harm the reputation of another by lowering him or her in the estimation of the community or, more broadly stated, one that exposes a plaintiff to hatred, ridicule, or contempt or injures his business or reputation or occupation. Standard Jury InstructionsCivil Cases (No. 00-1), 795 So.2d at 55.
The use of a different standard, which is the main distinction between the elements of false light and defamation, is the theoretical mechanism for protecting the two different interests at issue. A false light plaintiff must prove that the publicity would be "highly offensive to a reasonable person," whereas a defamation plaintiff must prove injury to his or her reputation in the community. As explained by the Ohio Supreme Court in recognizing false light, "in defamation cases the interest sought to be protected is the objective one of reputation, either economic, political, or personal, in the outside world. In privacy cases the interest affected is the subjective one of injury to [the] inner person." Welling v. Weinfeld, 113 Ohio St.3d 464, 866 N.E.2d 1051, 1057 (2007) (emphases added) (quoting Crump v. Beckley Newspapers, Inc., 173 W.Va. 699, 320 S.E.2d 70, 83 (1984)).
We acknowledge the nature of the interests to be protected is always a relevant concern in deciding whether to recognize a cause of action. As we stated in Cason, it is the Court's duty in this realm to ensure that there is "protection of the individual in the enjoyment of all of his inherent and essential rights and to afford a legal remedy for their invasion." 20 So.2d at 250. Therefore, if there is a unique interest that could be protected by false light, that certainly might be one reason for deciding to recognize the tort. However, if the interest is not unique and is adequately addressed by defamation, then that would militate against the need for the tort.
In this instance, although the standard may be different in principle, it may be a distinction without a difference in practice because conduct that defames will often be highly offensive to a reasonable person, just as conduct that is highly offensive will often result in injury to one's reputation. See Bueno, 54 P.3d at 902. As noted by the Colorado Supreme Court:
We believe that recognition of the different interests protected rests primarily on parsing a too subtle distinction between an individual's personal sensibilities and his or her reputation in the community. In fact, the United States Supreme Court trampled any such subtleties in Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977). "`The interest protected' in permitting recovery for placing the plaintiff in a false light `is clearly that of reputation, with the same overtones of mental distress as in defamation.'" Id. at 573, 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (quoting Prosser, supra, at 400.).
... False statements that a plaintiff finds "highly offensive" will generally either portray that plaintiff negatively or attack his conduct or character. At the same time, publicized statements that are disparaging and false satisfy the elements of defamation. Thus, the same publications that defame are likely to offend, and publications that offend are likely to defame.
Bueno, 54 P.3d at 902 (citation omitted).
Moreover, the interests are even less distinct when considering the fact that a false light plaintiff may also recover damages for "harm to his reputation," even though false light originally existed to compensate a plaintiff for an injury to their inner and personal feelings or emotional *1110 distress. See Restatement (Second) of Torts § 652H, cmt. a. This mirrors the harm that defamation law seeks to prevent, which has led some courts to conclude that while the torts are theoretically dissimilar, they are almost identical when put into practice. See, e.g., Cain, 878 S.W.2d at 581 ("[M]any, if not all, of the injuries redressed by the false light tort are also redressed by defamation."). In fact, in states such as Florida, which do not require damage to reputation as a predicate to a defamation action, there may be no distinction in recoverable damages. Compare Miami Herald Publ'g Co. v. Ane, 458 So.2d 239, 242-43 & n. 3 (Fla.1984) (quoting Time, Inc. v. Firestone, 424 U.S. 448, 460, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976), which notes that "States could base [defamation] awards on elements other than injury to reputation," such as "personal humiliation and mental anguish and suffering") and In re Standard Jury Instructions (Civil Cases 89-1), 575 So.2d 194, 198 (Fla.1991) (same) with Restatement (Second) of Torts § 652H, cmt. b (stating that a plaintiff in an invasion of privacy action can recover damages for emotional distress or personal humiliation). Therefore, absent such a distinction, most injuries capable of being remedied by false light could also be remedied by defamation. Cain, 878 S.W.2d at 581.
On the other hand, the very fact that false light is defined in subjective terms is one of the main causes for concern because the type of conduct prohibited is difficult to define. Unlike defamation, which has a defined body of case law and applicable restrictions that objectively proscribe conduct with "relative clarity and certainty," false light and its subjective standard create a moving target whose definition depends on the specific locale in which the conduct occurs or the particular sensitivities of the day. Bueno, 54 P.3d at 903-04. As we now discuss, utilizing a subjective standard that "fails to draw reasonably clear lines between lawful and unlawful conduct" may impermissibly restrict free speech under the First Amendment. Cain, 878 S.W.2d at 584.

D. First Amendment Implications
As noted by the United States Supreme Court, "[o]ur profound national commitment to the free exchange of ideas, as enshrined in the First Amendment, demands that the law of libel carve out an area of `breathing space' so that protected speech is not discouraged." Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 686, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) (quoting Gertz v. Robert Welch, Inc., 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)). "Whatever is added to the field of libel is taken from the field of free debate." N.Y. Times Co. v. Sullivan, 376 U.S. 254, 272, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The same can also be said for the tort of false light invasion of privacy. Indeed, this Court recognized in Cason that there was an important need to balance the right to be let alone against the legitimate interests flowing from free speech and free press. 20 So.2d at 251.
However, the "highly offensive to a reasonable person" standard runs the risk of chilling free speech because the type of conduct prohibited is not entirely clear:
Because tort law is intended both to recompense wrongful conduct and to prevent it, it is important that it be clear in its identification of that wrongful conduct. The tort of false light fails that test. The sole area in which it differs from defamation is an area fraught with ambiguity and subjectivity. Recognizing "highly offensive" information, even framed within the context of what a reasonable person would find highly offensive, necessarily involves a subjective component. The publication of highly *1111 offensive material is more difficult to avoid than the publication of defamatory information that damages a person's reputation in the community. In order to prevent liability under a false light tort, the media would need to anticipate whether statements are "highly offensive" to a reasonable person of ordinary sensibilities even though their publication does no harm to the individual's reputation. To the contrary, defamatory statements are more easily recognizable by an author or publisher because such statements are those that would damage someone's reputation in the community. In other words, defamation is measured by its results; whereas false light invasion of privacy is measured by perception.

Bueno, 54 P.3d at 903 (emphasis added). The Colorado Supreme Court ultimately refused to recognize false light because it "is too amorphous a tort" and "risks inflicting an unacceptable chill on those in the media seeking to avoid liability." Id. at 904. This sentiment was echoed by the Texas Supreme Court:
The Restatement adds an element not associated with defamation, the requirement that the statement places the subject in a false light "highly offensive" to the reasonable person. The distinction fails to draw reasonably clear lines between lawful and unlawful conduct, however. "A law forbidding or requiring conduct in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates due process." Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964); see also Hustler Magazine v. Falwell, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) (classification of speech as "outrageous" for suits for intentional infliction of emotional distress does not provide a meaningful standard, and would allow jury to impose damages on the basis of the jurors' tastes or views).
Thus, the uncertainty of not knowing what speech may subject the speaker or writer to liability would have an unacceptable chilling effect on freedom of speech.
Cain, 878 S.W.2d at 584.
In addition, many safeguards and privileges have been established throughout the years that have effectively balanced the right of individuals to be free from defamatory statements against the rights guaranteed by the First Amendment to freedom of expression. See Phila. Newspapers, Inc. v. Hepps, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986) (requiring public-figure plaintiffs in a matter of public concern to prove falsity); Curtis Publ'g Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (applying "actual malice" standard to suits by public figures against publishers); N.Y. Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (applying "actual malice" standards to suits by public officials against publishers). In Florida, this Court and the district courts have also applied various privileges to defamatory statements. See Abram v. Odham, 89 So.2d 334, 335-36 (Fla.1956) (qualified privilege for fair and accurate statements made in reporting on official government activities); Layne v. Tribune Co., 108 Fla. 177, 146 So. 234, 238 (1933) (qualified privilege for defamatory statements republished by a defendant); Abraham v. Baldwin, 52 Fla. 151, 42 So. 591, 592 (1906) (qualified privilege for defamatory statements made by a person who has a duty, interest or right in a specific subject matter); Fullerton v. Fla. Med. Ass'n, 938 So.2d 587, 592 (Fla. 1st DCA 2006) (stating that the common law recognizes that an absolute privilege extends to a witness's testimony in relation to an existing judicial *1112 proceeding); Demby v. English, 667 So.2d 350, 353 (Fla. 1st DCA 1995) ("Under Florida common-law principles anyone who publishes defamatory matter is not liable if the remarks are published upon a conditionally privileged occasion and the privilege is not abused.").
The Florida Legislature has also provided certain requirements for plaintiffs to meet in order to bring a defamation suit, which serve to protect First Amendment interests. Under Florida's defamation law, a prospective plaintiff is required to give a media defendant notice five days before initiating a civil action. § 770.01, Fla. Stat. (2007). The notice must specify the alleged false and defamatory statements contained in the article or broadcast. Id. Further, section 770.02, Florida Statutes (2007), limits the amount of damages a plaintiff may recover where: (1) the statements were published in good faith; (2) the statements were false due to an honest mistake of facts; (3) there were reasonable grounds for believing the statements were true; and (4) a full and fair correction, apology, or retraction was published or broadcast within a specific time period. We believe that all of these protections are necessary to ensure the delicate balance between preventing tortious injury resulting from defamatory statements and protecting the constitutional right to free speech.
Although defamation actions are governed by these extensive protections, the same cannot be said for actions in false light. Without these protections that have slowly developed over the years, recognizing false light could persuade plaintiffs to circumvent these safeguards in order to ensure recovery, even though the same conduct could equally be remedied under defamation law. The Restatement echoes this concern:
When the false publicity is also defamatory so that either action can be maintained by the plaintiff, it is arguable that limitations of long standing that have been found desirable for the action for defamation should not be successfully evaded by proceeding upon a different theory of later origin, in the development of which the attention of the courts has not been directed to the limitations.
As yet there is little authority on this issue. The answers obviously turn upon the nature of the particular restrictive rule, the language of a particular statute and the circumstances of the case, and no generalization can be made.
Restatement (Second) of Torts § 652E cmt. e.
We acknowledge that this risk could be alleviated by simply extending all of the defamation safeguards to actions for false light, much as some courts in other jurisdictions have done. See, e.g., West v. Media Gen. Convergence, Inc., 53 S.W.3d 640 (Tenn.2001) (applying defamation privileges to false light); Russell v. Thomson Newspapers, Inc., 842 P.2d 896 (Utah 1992) (same); Crump v. Beckley Newspapers, Inc., 173 W.Va. 699, 320 S.E.2d 70 (1984) (same); see also Cain, 878 S.W.2d at 582 (noting other jurisdictions that have applied the defamation safeguards to false light). However, we conclude that it is more prudent for the Florida legislature to address these issues by statute, such as the application of privileges, the prerequisites to suit, and the governing statute of limitations. In fact, we note that this matter has already been studied by the Legislature, but no action has yet been taken. See Fla. S. Comm. on Judiciary, Analysis of Cause of Action for False Light Invasion of Privacy (Nov.2007) (on file with the Florida State Archives). Furthermore, because many statements could form the basis of actions for either defamation or *1113 false light, "no useful purpose would be served by the separate tort if these restrictions [we]re imposed." Cain, 878 S.W.2d at 582.

E. Rejection Of The False Light Tort
Based upon our review of the law in Florida and in many other jurisdictions, we simply cannot ignore the significant and substantial overlap between false light and defamation. Although we acknowledge that a majority of the states have recognized the false light cause of action, we are struck by the fact that our review of these decisions has revealed no case, nor has one been pointed out to us, in which a judgment based solely on a false light cause of action was upheld. In fact, as exemplified by the Texas Supreme Court's decision in Cain, many of the decisions reveal that the cause of action could have been brought as, or was included as an alternative to, a claim for defamation. See 878 S.W.2d at 581 (noting that all of the false light claims brought in Texas "could have been brought ... under another legal theory," and refusing to recognize false light "when recovery for that tort is substantially duplicated by torts [such as defamation] already established in [Texas]"). As one commentator concluded, after reviewing six hundred false light cases through the country, false light most often duplicates defamation and "there is not even a single good case in which false light can be clearly identified as adding anything distinctive to the law." J. Clark Kelso, False Light Privacy: A Requiem, 32 Santa Clara L.Rev. 783, 785 (1992). Our own review of cases in Florida reveals a similar conclusion.[14]
These observations lead us to two competing conclusions. On the one hand, recognizing the tort would apparently not open the proverbial floodgates to false light claims. Yet, the fact that we can find no judgment that has been upheld by an appellate court solely on the basis of false light leads us to conclude that the absence of false light does not create any significant void in the law. Indeed, there are relatively few scenarios where defamation is inadequate and false light provides a potential for relief. The Restatement discusses one such example:
A is a war hero, distinguished for bravery in a famous battle. B makes and exhibits a motion picture concerning A's life, in which he inserts a detailed narrative of a fictitious private life attributed to A, including a non-existent romance with a girl. B knows this matter to be false. Although A is not defamed by the motion picture, B is subject to liability to him for invasion of privacy.
Restatement (Second) of Torts § 652E cmt. b, illus. 5. Another illustration may be the portrayal of the plaintiff as suffering from a terminal illness, which is "not necessarily defamatory, but [is] potentially highly offensive." Bueno, 54 P.3d at 902-03. *1114 However, to the extent that there may be a subset of cases where there is a wrong without a remedy, we consider that interest too tenuous to be recognized through the tort, most especially in light of the First Amendment concerns. In fact, it appears that the reason there has recently been a spate of false light claims in this State may be because of an attempt to circumvent the shorter statute of limitations for defamation as well as the other statutory prerequisites for a defamation claim. See Anderson, 947 So.2d at 7-8 (concluding that a claim for false light was specifically brought to "circumvent the shorter limitations period that applies to defamation actions" and that it should be treated the same as defamation or the "strict requirements in the law of defamation would have no effect at all").
We once again acknowledge that it is our duty to ensure the "protection of the individual in the enjoyment of all of his inherent and essential rights and to afford a legal remedy for their invasion." Cason, 20 So.2d at 250. However, because the benefit of recognizing the tort, which only offers a distinct remedy in relatively few unique situations, is outweighed by the danger of unreasonably impeding constitutionally protected speech, we decline to recognize a cause of action for false light invasion of privacy.

III. The Applicable "Community" Standard In Defamation Cases
Because we decline to recognize the tort of false light, we do not address the actual viability of Rapp's false light claim, except to note that her claim is based on statements she asserts are in fact false. Although the Fourth District found that the statements about Rapp being a convert to Jews for Jesus could be "highly offensive to a reasonable person," the court also concluded that these statements could not be defamatory because the "common mind" reading the newsletter would not have found Edith to be an object of "hatred, distrust, ridicule, contempt or disgrace." Rapp, 944 So.2d at 464, 467. In so doing, the Fourth District failed to embrace the standard that a communication is defamatory if it prejudices the plaintiff in the eyes of a "substantial and respectable minority of the community." Id. at 465-66. That standard, it noted, is encompassed within comment e to section 559 of the Restatement (Second) of Torts. However, it declined to apply comment e because it concluded that this Court had not adopted that standard in any case. Id. at 466.
We recognize that our precedent is silent regarding the relevant "community" standard for a defamation claim. Nevertheless, because the relevant "community" standard was the basis for rejecting her defamation claim as a matter of law, we consider this issue important to discuss.[15] Comment e to section 559 states, in pertinent part:
A communication to be defamatory need not tend to prejudice the other in the eyes of everyone in the community or of all of his associates, nor even in the eyes of a majority of them. It is enough that the communication would tend to prejudice him in the eyes of a substantial and respectable minority of them, and that it is made to one or more of them or in a manner that makes it proper to assume that it will reach them.

Restatement (Second) of Torts § 559 cmt. e (emphasis added). Although there does not appear to be much discussion in case *1115 law on what constitutes the relevant "community," except for this provision of the Restatement, this Court has stated that a plaintiff has a claim for defamation if he or she suffers injury in his or her "personal, social, official, or business relations." Land v. Tampa Times Publ'g Co., 68 Fla. 546, 67 So. 130, 130 (Fla.1914).
The most extensive discussion regarding the applicable "community" standard appears to be in Peck v. Tribune Co., 214 U.S. 185, 188, 29 S.Ct. 554, 53 L.Ed. 960 (1909), where the plaintiff brought a libel action against a publisher for the unauthorized use of her picture for an advertisement. In finding in favor of the plaintiff, the Court stated:
If the advertisement obviously would hurt the plaintiff in the estimation of an important and respectable part of the community, liability is not a question of a majority vote.
We know of no decision in which this matter is discussed upon principle. But obviously an unprivileged falsehood need not entail universal hatred to constitute a cause of action. No falsehood is thought about or even known by all the world. No conduct is hated by all. That it will be known by a large number, and will lead an appreciable fraction of that number to regard the plaintiff with contempt, is enough to do her practical harm. Thus, if a doctor were represented as advertising, the fact that it would affect his standing with other of his profession might make the representation actionable, although advertising is not reputed dishonest, and even seems to be regarded by many with pride.
Id. at 190, 29 S.Ct. 554.
We agree with the logical conclusion of the Supreme Court. Indeed, our Standard Jury Instructions, which state that a defamatory statement tends to injure the plaintiff's "business or reputation, or occupation," do not indicate that the statement must be construed as defamatory by the community at large. Standard Jury InstructionsCivil Cases (No. 00-1), 795 So.2d at 57. We find that the harm that stems from a defamatory statement as objectively interpreted by a "substantial and respectable" minority of the community is entitled to protection. We therefore adopt comment e to section 559 of the Restatement as stating the appropriate "community" standard for analyzing a defamation claim.[16]

CONCLUSION
In conclusion, we decline to recognize false light as a viable cause of action in this state. Therefore, we answer the certified question in the negative and quash the Fourth District's decision reinstating Rapp's false light claim. In addition, we conclude that the appropriate standard in defamation cases is a "substantial and respectable minority" of the community, as set forth in the Restatement. Because the Fourth District rejected this "community" standard, we also quash the Fourth District's decision affirming the dismissal of Rapp's defamation claim. However, we do not express an opinion as to the merits of this claim and invite the Fourth District to revisit any issues surrounding the defamation claim, including whether Rapp has sufficiently stated a cause of action. Accordingly, we remand to the Fourth District for further proceedings consistent with this opinion.
It is so ordered.
*1116 QUINCE, C.J., ANSTEAD and LEWIS, JJ., concur.
WELLS, J., concurs in part and dissents in part with an opinion.
CANADY and POLSTON, JJ., did not participate.
WELLS, J., concurring in part and dissenting in part.
I concur with the majority in respect to its decision to reject a false light cause of action and the quashing of the district court decision reversing the trial court's dismissal of the false light claim.
I dissent from the majority's decision to quash the district court's dismissal of the defamation claim. I would not adopt section 559, comment e of the Restatement (Second) of Torts (1977). Our defamation law has long been stable. We have standard jury instructions[17] which set out our law and which have not been challenged. No need has been demonstrated to change this settled law.
It has been over ninety-nine years since the United States Supreme Court decided Peck v. Tribune Co., 214 U.S. 185, 188, 29 S.Ct. 554, 53 L.Ed. 960 (1909). For this entire period we have found no need to adopt the language from Peck or the Restatement of Torts comment e, which apparently has its origin in Peck. I believe that there is a sound reason for not doing so. The standard of a "substantial and respectable minority" is plainly too vague to be a fairly applied standard. There is no way to know how many it takes to constitute a "substantial" number or what constitutes a "respectable minority." What does "respectable" mean in this context?
There is a natural tension between the law of libel and defamation and the First Amendment. Because of the essential and vital role of the First Amendment's freedom of speech guarantee in our country and state, I believe that the vague standard of comment e is too burdensome to that freedom to be adopted.
NOTES
[1] A total of 13 paragraphs were stricken from the original 38-paragraph complaint. For example, paragraph 4 alleged that "Jews for Jesus attempts to convince Jews that they can accept concepts which are alien and contrary to Jewish beliefs yet remain Jewish in order to fraudulently induce them to join their movement." Complaint at 1, Rapp v. Jews for Jesus, Inc., No. 502003CA013234XXOCAH (Fla. 15th Cir. Dec. 11, 2003), 2003 WL 25757568. Further, in paragraph 20, the complaint alleges that "[a] further motive for fabrication was to help advance the erroneous concept that many Jews have adopted the beliefs of Jews for Jesus. In order to promote its false teachings, Jews for Jesus attempts to inflate the number of its converts." Id. at 4.
[2] The successor judge who ruled on the final motion to dismiss interpreted the earlier judge's order of dismissal as based on the First Amendment, which "`prohibit[s] excessive entanglement of the courts in religious disputes.'" Rapp, 944 So.2d at 463. On appeal, the Fourth District rejected the First Amendment as a basis for dismissal of the complaint, relying on Malicki v. Doe, 814 So.2d 347 (Fla.2002). See Rapp, 944 So.2d at 464. Neither party pursued this issue in this Court.
[3] The court specifically addressed the merits of Rapp's defamation, false light and intentional infliction of emotional distress claims. Id. at 464-68. The Fourth District concluded that the newsletter publication did not amount to conduct that gives rise to a cause of action for intentional infliction of emotional distress. Id. at 466-67. Further, the court concluded that Rapp had abandoned her claim for negligent infliction of emotional distress. Id. at 469.
[4] Accordingly, the district court reversed the dismissal of Rapp's false light claim. In addition, the court reversed the dismissal of Rapp's negligent training and supervision claims, which was based on the dismissal of the other claims, but affirmed the dismissal of the defamation claim. Id. at 468-69. The Fourth District directed that on remand Rapp "should be given leave to succinctly replead her claims, without excessive editorialization, so that there is one working complaint, and not causes of action sprinkled in various pleadings." Id. at 469.
[5] In The Right to Privacy, 4 Harv. L.Rev. 193, 206 (1890), Warren and Brandeis concluded that the law "affords a principle which may be invoked to protect the privacy of the individual from invasion either by the too enterprising press, the photographer, or the possessor of any other modern device for recording or reproducing scenes or sounds." Brandeis was later appointed to the United States Supreme Court and served as a justice from 1916 to 1939.
[6] In Florida, the tort of commercial appropriation is set forth in section 540.08, Florida Statutes (2007). See generally Tyne v. Time Warner Entm't Co., 901 So.2d 802 (Fla.2005).
[7] In Ginsberg, we stated that the four categories were:

(1) appropriationthe unauthorized use of a person's name or likeness to obtain some benefit; (2) intrusionphysically or electronically intruding into one's private quarters; (3) public disclosure of private facts the dissemination of truthful private information which a reasonable person would find objectionable; and (4) false light in the public eyepublication of facts which place a person in a false light even though the facts themselves may not be defamatory.
863 So.2d at 162 (quoting AHCA, 678 So.2d at 1252 n. 20). Although the Court noted that it had previously "set out the categories of the tort of invasion of privacy for the purpose of illustrating a point, not to directly address the point of what alleged facts state a cause of action for the tort of invasion of privacy," we "affirm[ed] that the statement in AHCA does correctly state what is included in Florida's tort of invasion of privacy." Id. However, this statement is purely dicta because the issue before the Court in that case did not involve false light.
[8] In West v. Caterpillar Tractor Co., 336 So.2d 80, 86-87 (Fla.1976), this Court recognized a cause of action for strict liability because public policy weighed in favor of shifting the costs of a defective product to the manufacturer. Conversely, in Fassoulas v. Ramey, 450 So.2d 822, 823-24 (Fla.1984), the Court declined to allow child-rearing damages for the wrongful birth of a healthy child where public policy concerns militated against shifting the cost of child-rearing from the parents to the negligent physician.
[9] Cason involved a colorful storya lawsuit brought by a census taker for damages against Marjorie Kinnan Rawlings, the Pulitzer Prize winning author of "Cross Creek." Id. at 244-45. The plaintiff alleged that Rawlings had described her as "profane friend Zelma, the census taker" and included some graphic descriptions of her colorful language referred to by the author as her own "special brand of profanity." Id. at 246-47. The Court conducted a scholarly review of the history of the "right of privacy," before concluding that it is not "merely incidental to some other recognized right." Id. at 250.
[10] The majority in Heekin assumed the existence of the cause of action and focused instead on the applicable statute of limitations. See Heekin, 789 So.2d at 357-59.
[11] Media General Operations, Inc., The New York Times Co., Orlando Sentinel Communications Co., Sun-Sentinel Co., Florida Press Association, ABC, Inc., ESPN, Inc., E.W. Scripps Co., Association of American Publishers, and Cox Enterprises filed a joint amicus brief in support of Jews for Jesus, Inc.
[12] This specific instruction applies in the case where the plaintiff is a private claimant bringing a claim against a nonmedia defendant. A similar instruction applies in the case where the plaintiff is a public official or public figure or where the plaintiff is a private claimant bringing a claim against a media defendant:

A statement is in some significant respect false if its substance or gist conveys a materially different meaning than the truth would have conveyed. In making this determination, you should consider the context in which the statement is made and disregard any minor inaccuracies that do not affect the substance of the statement.
Id. at 55-56.
[13] We have carefully considered the risk of constitutional infringement of free speech by imposing liability for publication of a true statement. Indeed, the Florida Constitution states:

In all criminal prosecutions and civil actions for defamation the truth may be given in evidence. If the matter charged as defamatory is true and was published with good motives, the party shall be acquitted or exonerated.
Art. I, § 4, Fla. Const. However, in a defamation by implication claim, the "matter charged as defamatory" is not the literally true statement, but the false impression given by the juxtaposition or omission of facts. Accordingly, truth remains an available defense to defendants who can prove that the defamatory implication is true.
[14] For example, in Straub v. Lehtinen, Vargas & Riedi, P.A., 980 So.2d 1085 (Fla. 4th DCA 2007), notice invoking discretionary jurisdiction filed, No. SC08-110 (Fla. Jan. 14, 2008), the plaintiff alleged that a press advisory entitled "South Carolina Bankruptcy Court Rules Against Glenn Straub" placed him in a false light by implying he was a party to the litigation and subject to the bankruptcy court's order. Id. at 1086. However, the facts would appear to also state a claim for defamation since an allegation that a bankruptcy court has ruled against an individual could indeed harm one's reputation. Nevertheless, the trial court dismissed the complaint for failure to state a claim. Id. In reversing the lower court ruling, the Fourth District concluded that the complaint sufficiently alleged the elements of a false light cause of action but once again certified the question of whether false light exists. Id. at 1087. We stayed Straub pending the outcome of our decision in this case. Lehtinen, Vargas & Riedy, P.A. v. Straub, No. SC08-110 (Fla. order staying proceedings Jan. 31, 2008).
[15] Rapp has raised this issue before this Court; thus, we have jurisdiction to address it. See Feller v. State, 637 So.2d 911, 914 (Fla. 1994) (stating that the Court has jurisdiction "over all issues" in a certified question case).
[16] We caution that the "substantial and respectable minority" standard is tempered with the statement that defamation is also not "a question of the existence of some individual or individuals with views sufficiently peculiar to regard as derogatory what the vast majority of persons regard as innocent." Restatement (Second) of Torts § 559 cmt. e.
[17] See Fla. Std. Jury Instr. (Civ.) MI 4.1-4.4.